UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


DONNA M. PROVINCE,                    )
                                      )
                    Plaintiff,        )
                                      )
                                      )
    vs.                               )        No. 4:09CV01038 AGF
                                      )
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )
Administration,                       )
                                      )
                    Defendant.        )


## MEMORANDUM AND ORDER

This action is before this Court for judicial review of the final decision of the

Commissioner of Social Security finding that Plaintiff Donna M. Province was not

disabled and, thus, not entitled to disability insurance benefits under Title II of the Social

Security Act, 42 U.S.C. §§ 401-434, or supplemental security income ("SSI") under Title

XVI of the Act, id. §§ 1381-1384f.  For the reasons set forth below, the decision of the

Commissioner shall be affirmed.

Plaintiff, who was born on December 7, 1975, filed for benefits on March 7, 2007,

at the age of 31, alleging a disability onset date of August 14, 2006, due to microvascular

disease, fibromyalgia, borderline intellectual functioning, hearing loss in her right ear,

and asthma.  After Plaintiff's application was denied at the initial administrative level,

she requested a hearing before an Administrative Law Judge ("ALJ") and such hearing was held on February 17, 2009. Plaintiff and a vocational expert ("VE") testified at the hearing. By decision dated March 4, 2009, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform several jobs available in the state and national economy and was therefore not disabled. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on May 4, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that, in assessing her RFC, the ALJ failed to give proper weight to the medical opinion of one of Plaintiff's treating cardiologists (Harvey Serota, M.D.) and to Plaintiff's subjective complaints of pain. Plaintiff further argues that the ALJ erred by relying on the VE's testimony that there were jobs that an individual such as Plaintiff could perform, because the testimony was in response to a hypothetical question that did not capture the true extent of Plaintiff's impairments. Plaintiff requests that the decision of the Commissioner be remanded for reconsideration.

## BACKGROUND

### Work History and Application Forms

On forms submitted in connection with her applications for benefits, Plaintiff represented that from December 2005 until January 5, 2007, she worked at a fast-food restaurant as a cashier/cook four hours per day. She indicated that she stopped working at this job because of her "medical condition." (Tr. 125). Her prior jobs included bagger,

2

telemarketer, and nurses aide, all of which were part-time (four hours per day) and most, if not all, of which she held for only a few months.  (Tr. 156-57.)

On a Function Report dated March 14, 2007, Plaintiff wrote that she lived in a house with her husband and two children (then ages six and eight).  On a typical day, she would wake up at 6:30 a.m., wake the children and take them to the bus stop, go back to sleep, wake up again to eat and shower, try to clean the house if she was not too tired, pick up her children from the bus stop, give them showers and dinner and help them with their homework, and then go to sleep.  Since the onset of her impairments, she could not stay on her feet "too long," she sometimes woke up with chest pains, and had "dizzy spells."

Plaintiff further represented that she dusted, did laundry, vacuumed, and cleaned the bathroom, but that it took her "a while" to do these chores.  She used to drive a car frequently but had not driven in the past few months because of dizzy spells.  She went grocery shopping twice a month and was able to pay bills, count change, handle a savings account, and use her checkbook, although since the onset of her condition, fractions and multiplication were very difficult for her.

Plaintiff indicated that she enjoyed reading and watching television, but sometimes could not do so because of her dizzy spells.  She went to church every Sunday and attended Bible study one evening a week unless she was not feeling well.  Her conditions affected her ability to stand for a long time, hear out of her right ear, remember things, complete tasks, concentrate, understand, and follow instructions.  She also reported that

she did not have the strength in her hands or arms to carry or lift heavy objects like she used to. (Tr. 138-45.)

**School and Medical Records**

A reevaluation summary by the Special School District ("SSD") of St. Louis County, Missouri, dated February 28, 1992, indicated that Plaintiff had originally been evaluated in 1982, at the age of seven, with a diagnosis of mildly mentally handicapped, and had been enrolled in a self-contained program for mentally handicapped students. In December 1985, Plaintiff's diagnosis was changed to learning-disabled and she began receiving programming in self-contained learning-disabled classrooms.

The reevaluation summary recorded a verbal IQ of 78, a performance IQ of 73, and a full-scale IQ of 75.[1] It noted that Plaintiff's math skills were "depressed," that she had to use a calculator for multiplication and division, but could add and subtract money. It was also noted that Plaintiff worked well in groups and independently, but needed to be reminded to remain on task. Her processing of oral directions seemed to be a problem, her thinking and reasoning skills were "fairly simplistic and concrete," and her written language skills were at the fourth-grade level. (Tr. 177-82.)

An SSD report dated May 31, 1994, stated that Plaintiff had successfully completed the "Supplemental Food Preparation and Service Program" and had met

---

[1]    The Wechsler Adult Intelligence Scale (3rd ed.) classifies IQ scores within the 70-79 range as borderline; within the 80-89 range as low average; and within the 90-109 range as average.

graduation goals for attendance and interpersonal, academic, and vocational skills.  (Tr. 174-76.)

On February 22, 2006, about six months before her alleged disability onset date, Plaintiff was examined by Christopher Perry, D.O., who diagnosed vertigo and hearing loss.  (Tr. 218-19.)  On June 5, 2006, Plaintiff reported to Dr. Perry that she experienced a "feeling of fainting."  (Tr. 216.)  On July 13, 2006, cardiologist Harvey Serota, M.D., examined Plaintiff.  She complained of fatigue, shortness of breath, palpitations, and chest pains that extended down her left arm.  Dr. Serota reported that Plaintiff's electrocardiogram ("EKG") was normal and diagnosed chest pains and fatigue "of unclear etiology" and asthma.  (Tr. 295-97.)  On July 19, 2006, tests conducted by Toniya Singh, M.D., revealed normal myocardial perfusion and an ejection fraction estimated at 65 percent.[2]  (Tr. 289, 307.)

On August 4, 2006, Dr. Serota noted that the test results were "fine" and again diagnosed chest pain of unclear etiology, possibly related to stress or due to microvascular disease.  (Tr. 299.)  On October 5, 2006, Dr. Serota examined Plaintiff and opined that she did not have structural heart disease, but could have microvascular disease or arrhythmia.  (Tr. 301-02.)  In all his above reports, Dr. Serota noted that Plaintiff's mood and affect were normal.

---

[2]    Ejection fraction measures a heart's efficiency, and is used to estimate the function of the left ventricle, which pumps blood to the rest of the body.  A normal ejection fraction ranges from 50-70 percent. http://my.clevelandclinic.org/heart/

On October 13, 2006, Plaintiff presented to the ER complaining of chest pain about twice a day lasting for several minutes, for the last few months.  The attending physician noted that Plaintiff reported that she was "quite active physically" and could "do all her activities without any limitations."  He diagnosed "very atypical" chest pain that was likely not due to coronary artery disease.  (Tr. 234-36.)  EKGs taken on that day and the following day were normal.  (Tr. 247-48.)

On October 19 and December 4, 2006, Dr. Serota examined Plaintiff and reported to Dr. Perry that he believed the Plaintiff had microvascular disease and possibly "orthostatic neurogenic syncope [unexplained fainting]."  He felt that Plaintiff's symptoms were being controlled with external counter pulsation ("ECP") and medication. Dr. Serota again noted that Plaintiff's mood and affect were normal.  (Tr. 303-06.)

On January 22, 2007, Plaintiff was seen by Dr. Perry with complaints of fatigue. (Tr. 210-11.)  On March 5, 2007, she presented to the ER complaining of chest pain, a cough, dizziness, and a headache.  The diagnosis was acute bronchitis and pleurisy.  A chest x-ray and EKG were normal.  (Tr. 265, 271, 285.)  On March 9, 2007, Dr. Serota again diagnosed recurrent chest pain, and noted negative test results, including a negative tilt table test.[3]  He again noted that Plaintiff's mood and affect were normal.  (Tr. 293-94.)  On April 2, 2007, nonexamining state consulting psychologist Sherry Bassi, Ph.D, completed a Mental RFC Assessment.  Dr. Bassi indicated that Plaintiff would have

_____

[3]    A tilt table test is used to evaluate the cause of syncope. http://www.mayoclinic.com.

moderate difficulty with several work-related functions, such as understanding and remembering detailed instructions and maintaining attention and concentration for extended periods.  Dr. Bassi opined that Plaintiff was not significantly limited in other functions, such as understanding, remembering, and carrying out short and simple instructions; performing activities within a schedule; maintaining regular attendance; and interacting appropriately with the general public.  (Tr. 314-16.)

On the same day, Dr. Bassi completed a Psychiatric Review Technique form on which she indicated that Plaintiff had organic mental disorders and borderline intellectual functioning which imposed mild restrictions of activities in daily living and in maintaining social functioning, and moderate limitations in maintaining concentration, persistence, or pace.  Dr. Bassi opined in narrative form that Plaintiff "would have difficulty performing more complex work-related activity and tasks.  However she is able to perform simple work and make simple work-related decisions."  (Tr. 325-27.)

On April 17, 2007, Plaintiff reported continued chest pain and dizzy spells to Dr. Serota who suggested that some of Plaintiff's dizziness might be a side effect of the beta blocker she was taking, and directed her to stop taking it.  Dr. Serota noted that Plaintiff's mood and affect were normal.  (Tr. 360-61.)  On May 8, 2007, Plaintiff went to the ER complaining of syncope, lightheadedness, diaphoresis (excessive sweating), chest pain, palpitations, and dyspnea (shortness of breath).  An EKG was normal and Holter monitoring showed that Plaintiff's symptoms of dizziness correlated with normal sinus rhythm.  (Tr. 329-32.)  On May 22, 2007, tilt table testing was negative.  (Tr. 365.)

On July 20, 2007, Plaintiff again went to the ER complaining of chest pain and shortness of breath and was diagnosed with chest pain, diarrhea, depression, and anxiety. She was admitted to the hospital with "intermediate coronary syndromes" and was discharged on July 23, 2007, with a diagnosis of chest pain and hematuria. (Tr. 377-82.) On August 30, 2007, Plaintiff complained of fatigue, palpitations, and a headache, and was diagnosed with a heart condition, malaise, gastroesophageal reflux disease, chronic pain, and possible lupus. (Tr. 422-25.)

On October 25, 2007, Plaintiff saw Ali Zarmeena, M.D., a rheumatologist, as a new patient. Plaintiff complained of chronic pain throughout her body that had been ongoing for over six months. On examination, Plaintiff's heart rate and rhythm were normal and no murmurs were heard. Examination for multiple sclerosis was "unremarkable." Dr. Zarmeena wrote, "No muscle tenderness was seen," but assessed "Arthralgias in multiple sites" and noted that Plaintiff had "multiple tender points." Dr. Zarmeena advised Plaintiff to do range of motion exercises and to take Ultram every six hours for pain and Flexeril twice daily. (Tr. 396-400.)

On January 10, 2008, Plaintiff complained to Dr. Zarmeena of fatigue and neck and back pain. Dr. Zarmeena noted that Plaintiff had no tender points and normal range of motion in her arms and legs, but she assessed fibromyalgia[4] and encouraged Plaintiff to

---

[4]     Fibromyalgia is a syndrome of chronic pain of musculoskeletal origin but uncertain cause. The American College of Rheumatology has established diagnostic criteria that include pain on both sides of the body, both above and below the waist, as well as in an axial distribution (cervical, thoracic, or lumbar spine or anterior chest);

consider a "Fit for Life" program.[5]  (Tr. 411-12.)

On January 11, 2008, Dr. Serota completed a cardiac RFC form assessing Plaintiff's ability to engage in work-related activities.[6]  He noted that Plaintiff's diagnoses included dizziness, microvascular disease, and "class 5" recurrent chest pain.  He identified Plaintiff's symptoms as intermittent chest pain, shortness of breath, fatigue, weakness, intermittent edema, nausea, palpitations, dizziness, and intermittent sweatiness.  Dr. Serota opined that Plaintiff experienced moderate chest pain a "couple times a week."  He opined that Plaintiff was incapable of even low-stress jobs due to chest pain.  He stated that her physical symptoms and limitations caused emotional difficulties and that emotional factors contributed to the severity of the symptoms and limitations.  Dr. Serota indicated that Plaintiff's cardiac symptoms were frequently severe enough to interfere with the attention and concentration needed to perform even simple work tasks.  He listed dizziness as a side effect of Plaintiff's medications and noted that she walked with a quad cane.  Dr. Serota felt that Plaintiff's impairments were likely to produce good days and bad days.  To the question, "As a result of your patient's impairments, estimate your patient's functional limitations if your patient were placed in a competitive work

_____

additionally there must be point tenderness in at least 11 of 18 specified sites.  Stedman's Medical Dictionary  725 (28th ed. 2006).

[5]    Fit for Life is a diet and lifestyle program designed to relieve pain from arthritis, fibromyalgia, lupus, and chronic fatigue syndrome.  www.fitforlifetime.com/

[6]    The form was also signed by Dr. Singh, M.D.

situation," he responded, "not applicable." (Tr. 369-74.)

Also on January 11, 2008, cardiologist Antonella Quattromani, M.D., referred Plaintiff for a neurological evaluation, due to her concern that multiple sclerosis or other neuromuscular disorder might be contributing to Plaintiff's symptoms. Dr. Quattromani reported Plaintiff's recent treatment for "postural orthostatic tachycardia syndrome" and diagnosis of fibromyalgia, and stated that Plaintiff had some improvement of pain on Toradol, but continued to have recurrent headaches and left-sided weakness that had progressed, had a significant decrease in strength on grip, and recently had been forced to walk with a cane due to the left-sided weakness. (Tr. 389.)[7]

On May 2, 2008, Plaintiff told Dr. Zarmeena that she was in a lot of pain with resultant anxiety and insomnia. Dr. Zarmeena again assessed fibromyalgia and advised Plaintiff to continue range of motion exercises and to continue taking Ultram and Flexiril, and to take nortriptyline (an antidepressant) as well. (Tr. 415-18.) On July 29, 2008, Plaintiff underwent a neurological evaluation by Morvarid Karimi, M.D., and Patrick Bushard, M.D. Plaintiff reported difficulty with activities of daily living, but the physicians opined that no functional interventions were required at that time. Plaintiff also reported constant aching pain in her arms, hands, legs, and back, and left-sided weakness and headaches once or twice a week with nausea. Drs. Karimi and Bushard believed that multiple sclerosis was the most likely diagnosis. Management was deferred

---

[7]   The next medical evidence in the record involving a neurological evaluation is dated July 29, 2008, as described below.

until Plaintiff had an MRI of her brain and cervical spine.  (Tr. 468-73.)

On September 5, 2008, Plaintiff complained to Dr. Zarmeena of a migraine and pain on the left side of her body.  Plaintiff suspected that she was pregnant and so stopped her pain medications.  Dr. Zarmeena noted that Plaintiff was going to get a nurse home aide to help with meals and cleaning, and that Plaintiff reported memory lapses or loss and anxiety.  Dr. Zarmeena again diagnosed fibromyalgia.  (Tr. 475-78.)  On September 23, 2008, Plaintiff tested positive for pregnancy, with an estimated delivery date of May 22, 2009.  (Tr. 283-44.)  On September 30, 2008, Plaintiff saw Dr. Bushard again, who noted that Plaintiff did not get an MRI because she was pregnant, and again suggested that Plaintiff most likely suffered from multiple sclerosis.  (Tr. 490-92.)

At an obstetrics appointment on October 7, 2008, Plaintiff reported no difficulty walking, getting dressed, bathing, grooming, eating, speaking or remembering, but reported difficulty with "activities of daily living," including cooking, cleaning, shopping, and driving.  It was noted that Plaintiff was "experiencing pain today.  Her pain is located.  She experiences this pain frequently and her pain is described as sharp."  (Tr. 497-98.)

On October 15, 2008, another EKG was normal.  (Tr. 540.)  The results of a cardiology exam dated June 2, 2008, were generally normal.  Plaintiff complained of weekly dizziness, without syncope.  (Tr. 553.)  At follow-up office visits with Dr. Quattromani on September 29, 2008, and December 5, 2008, dizziness was again noted.  (Tr. 554-55.)

**Evidentiary Hearing of February 17, 2009 (Tr. 14-58)**

Plaintiff, who was represented by counsel, testified that she was 33 years old, lived in a two-story house with her husband of five months and her two children, ages eight and ten, and was pregnant.  Her bedroom was upstairs, but recently she had been sleeping on the couch.  She was a high school graduate, but had received special education from third grade through 12th grade.  She could read but had difficulty with math; however, she could go to the grocery store by herself and make sure that she got the correct change.  She wrote letters and cards but did not use e-mail.

Plaintiff testified that her household's only current income was her ten-year-old son's ADHD disability check, and her Medicaid.  She had filed for unemployment benefits once but was found ineligible.  She last worked at a fast-food restaurant, from approximately 2005 to 2007, as a cashier, cleaning tables, and waiting on customers.  Towards the end of that time, she was only able to work part-time and then stopped altogether, on the advice of Dr. Quattromani, due to her heart problems and fibromyalgia.

Prior to this job, she worked as a t-shirt packager for a few months, a job she left because she was having problems with childcare.  Before that she worked for seven months at a motel as a housekeeper, but left this job because "it got to be too stressful."  Plaintiff testified that she had also worked at a grocery store as a bagger and at food counters for three years, starting out in a part-time position while she was still in high school, and ending in a full-time position.  Plaintiff held numerous other unskilled jobs, all for brief periods of time due to difficulties obtaining transportation and childcare.

Plaintiff testified that her conditions that made her currently unable to work included "left-side weakness" that resulted in her left leg giving out at times; problems with passing out; dizzy spells; and pain "all over in [her] joints, [her] body." She stated that she got chest pains about twice a week, and was currently taking metroprolol (used to treat angina) and Qvar (an inhaled steroid) for her asthma, and would be able to "get back on all [her] pain medicine and stuff" after her pregnancy. Plaintiff testified that she was also waiting until after her pregnancy to have an MRI.

Plaintiff stated further that she suffered from hearing loss in her right ear, but wore a hearing aid and could hear "pretty good." She stated that she had a heart murmur, causing her heart to "beat real fast" at times, and that she had a doctor's appointment scheduled for March 5, 2009. Plaintiff testified that she routinely woke up at 6:30 a.m. but that her husband usually got her children ready for school because her fibromyalgia made it difficult to get out of bed.

Upon examination by her counsel, Plaintiff testified that she had been using a four- prong cane for just over one year, and always used it unless her husband was with her to hold her hand. She needed the cane because approximately once every other month for the past year, she had had "spells where [she would] pass out like [her] vision will go blurred and then [she would] get real hot and sweaty and [her] leg [would] collapse." Plaintiff testified that her chest pains and fibromyalgia were "really painful," and that she often had trouble sleeping because of the pain, causing her to feel very tired when she woke up. This pain and exhaustion had begun before her pregnancy. She had

good and bad days, experiencing unbearable pain on the bad days. Her condition had worsened since leaving her last job upon the advice of her doctor. She stated that she did not believe she could now do any of her previous jobs, on a full-time basis because she was "just so exhausted" and "miserable."

The ALJ then reexamined Plaintiff. He recited her daily activities as set forth on the March 14, 2007 Function Report, and inquired as to what had changed since then. Plaintiff stated that she had been having a nurse help her with cooking and cleaning for the last four months, and that "everybody else helps out" with the chores. Plaintiff also testified that she was not going to church as frequently as she used to.

The VE was asked to consider an individual with Plaintiff's vocational factors (education, training, and work experience) who could lift and carry 20 pounds occasionally, and ten pounds frequently; stand, walk, and sit for six hours in an eight-hour workday; demonstrate adequate judgment to make simple work related decisions; perform repetitive work according to set procedure, sequence, or pace; and perform some complex tasks. The ALJ testified that such an individual would be able to perform some of Plaintiff's past jobs, such as fast-food worker, housekeeper, and cashier.

The ALJ then posed a second hypothetical question. He asked the ALJ to consider an individual with Plaintiff's vocational factors, who required a sit/stand option at the workplace, and who could lift and carry a maximum of ten pounds, understand and carry out simple instructions and non-detailed tasks, maintain concentration and attention for two-hour segments over an eight hour period, and adapt to routine, simple work changes.

14

The ALJ testified that this individual would not be able to perform the jobs he had identified, but could perform some sedentary and unskilled assembly work involving cosmetics, packaging work of pharmaceuticals or CDs, or stuffing toys or small items.

The VE then stated that if this individual would have up to three absences per month because of pain, there would be no jobs she could perform. If she had to use a cane to ambulate, she would be able to perform the sedentary jobs identified, as long as she did not have to rely on the cane at work. If the individual described in the second hypothetical would have difficulty maintaining the attention and concentration necessary to perform even simple work tasks for over one-third of the day, there would be no jobs she could perform. If the individual described in the second hypothetical experienced unpredictable spells of chest pain several times a week requiring her to leave work for more than just a few minutes to regain the ability to return and perform the tasks required, there would be no jobs she could perform. Lastly, the VE stated that if the individual described in the second hypothetical experienced dizzy spells and blurry vision and collapsed unexpectedly every other month, there would be no jobs she could perform.

**ALJ's Decision of March 4, 2009 (Tr. 5-13)**

The ALJ found that Plaintiff had the severe impairments of microvascular disease, fibromyalgia, and borderline intellectual functioning, but that Plaintiff's condition did not meet or medically equal a deemed-disabling impairment listed in the Commissioner's regulations. The ALJ then determined that Plaintiff required a sit/stand option with the ability to change her position frequently, but otherwise had the RFC to lift or carry ten

pounds; understand, remember, and carry out simple instructions and non-detailed tasks; maintain concentration and attention for two-hour segments over an eight-hour day; and adapt to simple, routine changes in the workplace.  The ALJ stated that in making this finding, he considered the relevant factors in assessing a disability claimant's credibility, as set forth in Social Security Ruling ("SSR") 96-7p.

In support of his RFC assessment, the ALJ pointed to the negative stress, Holter and tilt table tests; Plaintiff's "unremarkable" EKG and chest x-ray results; and generally normal cardiovascular exam results.  The ALJ gave "slight weight" to Dr. Serota's January 11, 2008 cardiac RFC assessment.  The ALJ believed that Dr. Serota's opinion that Plaintiff was incapable of even low stress work because of chest pain was inconsistent with his statement in the same form that Plaintiff experienced chest pain only twice a week.  The ALJ also stated that Dr. Serota's assessment was inconsistent with the record as a whole.

The ALJ commented that although Plaintiff was diagnosed with fibromyalgia, she "seldom demonstrated tender points on exam."  With regard to Plaintiff's intellectual functioning, the ALJ found that although the record showed that Plaintiff had difficulty staying on task, it also showed that she could be re-directed to task, read at the fifth grade level, add and subtract money, use a calculator for multiplication and division, and perform tasks both independently and in a group.

The ALJ found that Plaintiff lacked credibility.  He stated that her testimony that she cared for her children and performed household chores was inconsistent with a

disabling condition. Her ability to go shopping indicated, according to the ALJ, a good ability to stand, walk, lift considerable weight, and "otherwise function." And although Plaintiff testified that she had an in-home aide for the past four months, she did not clarify whether her pregnancy was the reason for the aide. Further, although Plaintiff alleged a disability onset date of August 14, 2006, she informed the attending physician in the ER in October 2006 that she remained active physically and could perform all her activities without limitation. The ALJ also cited to Dr. Quattromani's June 2, 2008 report that Plaintiff only experienced dizziness once a week not accompanied by syncope.

The ALJ stated that the record did not show that a physician had recommended use of a four-prong cane. He also observed that Plaintiff testified that most of her jobs ended because of transportation or childcare difficulties rather than due to an impairment. Relying on the testimony of the VE, the ALJ concluded that Plaintiff could work as a cosmetic assembler, packager, or toy stuffer, and that therefore, Plaintiff was not disabled under the Social Security Act.

**Evidence Submitted to the Appeals Council**

In a statement provided to the Appeals Council, Plaintiff stated that her condition had worsened in that her chest pains increased from twice weekly to four times weekly, that she had a hard time sleeping due to increased pain, and that Dr. Bushard, whom she had last seen in September 2008, reported that she suffered from dementia. (Tr. 207.)

## **DISCUSSION**

### **Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). "Reversal is not warranted, however, 'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. Jan. 2009) (citations omitted); accord Gragg v. Astrue, ___F.3d___, 2010 WL 3075713, at *5 (8th Cir. Aug. 9, 2010) ("If substantial evidence supports the decision," this court "will not reverse, even if substantial evidence could have been marshaled in support of a different outcome.") (citation omitted).

18

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months.  42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton,  535 U.S. 212, 214-23 (2002).  The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity.  If so, benefits are denied.  If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments.  A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied.  If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations.  If so, the claimant is presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work, if any.  If the claimant can return to past relevant work, the claimant is not disabled.  Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent

with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Medical-Vocational Guidelines. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as pain or mental limitations, the must consider testimony of a VE as to the availability of jobs that a person with the claimant's profile could perform. Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

## Opinion of Plaintiff's Treating Physician

Plaintiff argues that in assessing her RFC, the ALJ committed reversible error by failing to properly consider the opinion expressed by treating cardiologist Dr. Serota in the January 11, 2008 cardiac RFC form. As described above, Dr. Serota opined that Plaintiff was incapable of even low-stress jobs due to chest pain. The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d).

The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent

with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2).

An ALJ need not defer to such an opinion, however, when it is not internally consistent or is not supported by acceptable clinical or diagnostic data. See Anderson v. Barnhart, 344 F.3d 809, 813 (8th Cir. 2003).

Here the Court concludes that the ALJ was entitled to give little weight to Dr. Serota's opinion in question. First, statements by a medical source that a claimant cannot work "are not medical opinions but opinions on the application of the statute, a task assigned solely to the discretion of the Secretary." Nelson v. Sullivan, 946 F.2d 1314, 1316 (8th Cir. 1991). Such statements simply are "not conclusive as to the ultimate question" of disability. Id. at 1316-17; accord House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) ("A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination.").

In addition, the ALJ's conclusion that Dr. Serota's January 11, 2008 opinion was inconsistent with the record as a whole is supported by the negative diagnostic stress, EKG, and Holter testing that Plaintiff had undergone. See, e.g., Robson v. Astrue, 526 F.3d 389, 393 (8th Cir. 2008) (noting that weight need not be given to a treating physician's opinion when that opinion is not supported by diagnostic testing).

**Plaintiff's Subjective Complaints**

Plaintiff also argues that the ALJ erred in not crediting Plaintiff's testimony because the ALJ failed to go through the relevant factors set forth in Polaski v. Heckler,

739 F.2d 1320, 1322 (8th Cir. 1984). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). In Polaski, the Eighth Circuit held that the "absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." An ALJ must also consider observations by third parties and treating and examining physicians relating to such matters as (1) the claimant's daily activities; (2) the frequency, duration, and intensity of the symptoms; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. 739 F.2d at 1322.

SSR 96-7p encompasses the same factors as those enumerated in Polaski, and additionally states that the ALJ should consider treatment, other than medication that the individual received for relief of pain or other symptoms, and any measures other than treatment the individual used to relieve pain or other symptoms (e.g., sleeping on a board). "If the ALJ discredits a claimant's credibility and gives a good reason for doing so, [the court] will defer to [his] judgment even if every factor is not discussed in depth." Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001).

In many disability cases, there is no doubt that the plaintiff experiences pain; "the real issue is how severe that pain is." Sampson v. Apfel, 165 F.3d 616, 619 (8th Cir. 1999) (citation omitted). Here, although there is evidence in this record that could support a different decision, upon review of the entire record, the Court concludes that

the Commissioner's decision that Plaintiff was not disabled is based upon substantial evidence.

Although the ALJ did not specifically reference <u>Polaski</u>, he did reference and consider the "<u>Polaski factors</u>," which are set forth in SSR 96-7p. The ALJ was entitled to find that the level of Plaintiff's daily activities, as reported on her Function Report dated March 14, 2007, and as testified to, detracted from the credibility of her assertion that she was physically unable to perform even sedentary work with a sit/stand option. It is true that the Eighth Circuit has often noted that a disability claimant's ability to perform household chores does not necessarily prove that the claimant is capable of full-time employment. <u>See, e.g.</u>, <u>Dixon v. Barnhart</u>, 324 F.3d 997, 1002 (8th Cir. 2003). Here, however, Plaintiff's activities, especially in taking care of two young children, suggests that she is physically able to work full-time at a sedentary job. <u>See</u> <u>Pena v. Chater</u>, 76 F.3d 906, 908 (8th Cir.1996) (holding that the plaintiff's ability to care for one child, occasionally drive, and sometimes go to the store supported the ALJ's decision that the plaintiff was not disabled). The Court notes that no medical source imposed physical restriction upon Plaintiff due to fibromyalgia, nor is no indication that any medical source believed that Plaintiff's fibromyalgia was disabling.

**<u>Hypothetical Question Posed to VE</u>**

Plaintiff contends that as a result of the above two asserted errors, the second hypothetical question posed to the VE was flawed, and thus the VE's answer did not constitute substantial evidence upon which the ALJ's decision could rest. Plaintiff argues

that in addition to this hypothetical not reflecting the limitations outlined in Dr. Serota's cardiac RFC assessment, the hypothetical did not take into account Plaintiff's left-sided weakness and falling, need for a cane, headaches, and presumed absenteeism.

Testimony by a VE "based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision." Hillier v. Soc. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (citation omitted). The questions, however, need not include alleged limitations which the ALJ properly discredits. Randolph v. Barnhart, 386 F.3d 835, 841-42 (8th Cir. 2004).

Here, the Court concludes that the critical hypothetical posed to the VE included all of Plaintiff's impairments accepted as true by the ALJ and excluded alleged impairments that the ALJ was entitled to discredit. Accordingly, the VE's testimony that there were sedentary unskilled jobs that an individual with Plaintiff's vocational factors and RFC could perform constituted substantial evidence in support of the ALJ's determination that Plaintiff was not disabled within the meaning of the Social Security Act. See, e.g., Gragg, 2010 WL 3075713, at *8.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated on this 20th day of September, 2010.